IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

STEVEN CHARLES                                                                                          PLAINTIFF

v.                                            Civil No. 1:22-cv-01002

UNION COUNTY, ARKANSAS and
JEFF ORR                                                                                              DEFENDANTS

**ORDER**

Before the Court is a Complaint filed pursuant to 42 U.S.C. § 1983 and the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-101 et seq. ECF No. 4. This case was filed by Plaintiff, Steven Charles ("Charles"). This case was originally filed in the Circuit Court of Union County, Arkansas and was subsequently removed to this Court. ECF No. 2.

On August 31, 2022, Defendants filed the current Motion for Summary Judgment. ECF No. 15. Charles has responded, and he argues his case against Defendants should not be dismissed. ECF No. 31. The Parties consented to the jurisdiction to this Court on January 24, 2022. ECF No. 7. This Motion is now ripe for consideration, and the Court finds this Motion should be **GRANTED IN PART** and **DENIED IN PART**.

I.  **Background**:

On December 6, 2021, Charles filed his Complaint. ECF No. 4. In this Complaint, Charles alleges he is an African-American individual who was employed by Defendant Union County, Arkansas and was supervised by Jeff Orr. *Id.* He alleges that in 2020, he was employed driving dump trucks and tractor trailers. *Id.* ¶ 6. He alleges that on December 9, 2020, he attempted to drive his work-issued truck, but it was unsafe. *Id.* ¶ 9. He claims his truck was unsafe because it was "pulling to the left and shaking" so hard that he had to take his truck to the shop multiple times. *Id.* ¶ 11. He claims that despite the fact his truck was unsafe to drive, he was still expected to deliver

1

his required loads; and he was fired when he came back to work because he had not "done enough loads for the day." *Id.* ¶ 15.

Charles claims his discharge was wrongful because he was discriminated against based upon his race (Count I) and his discharge was wrongful because it was "in violation of public policy" (Count II). ECF No. 4 ¶¶ 18, 22. He claims he "lost wages and benefits" and "endured mental, emotional, and physical suffering." *Id.* ¶¶ 19, 23. He claims Defendants' "actions have been in willful, malicious, and reckless violation of his rights." *Id.* ¶¶ 20, 24.

## II.     Applicable Law:

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a federal court is authorized to grant summary judgment in a case. Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c)(2). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on an issue where the nonmovant bears the burden of proof at trial. *See id.* at 324. A mere scintilla of evidence in support of the non-movant's position is insufficient. *Se Anderson,* 477 U.S. at 252. To survive a motion for summary judgment, "a nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." *Parks v. City of Horseshoe Bend, Arkansas,* 480 F.3d 837, 839 (8th Cir. 2007) (citation omitted). As stated in this rule, "[w]hen a motion for summary judgment is properly made and supported, an opposing party

may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." *Id.*

## III. **Discussion:**

Charles claims Defendants Union County, Arkansas and Jeff Orr terminated him in violation of 42 U.S.C. § 1983 and the ACRA, Ark. Code Ann. § 16-123-101 et seq. ECF No. 4. Specifically, he claims he was (1) unlawfully terminated on the basis of his race and (2) unlawfully terminated in violation of public policy. *Id.* The Court will consider both of these claims.

### A. Race Discrimination

For both his 1983 claim and his ACRA claim, the *McDonnell Douglas* burden-shifting analysis applies. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See also Burton v. Ark. Sec. of State,* 737 F.3d 1219, 1229 (8th Cir. 2013) (applying the burden-shifting to a Section 1983 race discrimination claim). *See also Schaffhauser v. United Parcel Service, Inc.,* 794 F.3d 899, 903 (8th Cir. 2015) (recognizing race discrimination claims under 1983, Title II, and the ACRA "are evaluated identically").

Under this framework, the plaintiff has the initial burden of establishing his or her *prima facie* case. *See McDonnell Douglas Corp.,* 411 U.S. at 802. Once the plaintiff makes that showing, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *See id.* at 802-03. If the employer satisfies this burden, the plaintiff must prove the proffered reason is a pretext for discrimination. *See id.* at 804-05.

#### 1. The *Prima Facie* Case

To establish a *prima facie* case for discrimination, a plaintiff must establish he or she meets the following requirements: (1) is a member of a protected class; (2) was qualified for his or her position; and (3) suffered an adverse employment action under circumstances permitting an

inference that the action was a result of unlawful discrimination. *See Habib v. Nations Bank,* 279 F.3d 563, 566 (8th Cir. 2001). To create an inference of discrimination and meet the requirements of the third element, a plaintiff can present evidence of disparate treatment between, for example, Caucasian and African-American individuals. *See EEOC v. Kohler Co. d/b/a Sterling Plumb. Group, Inc.,* 335 F.3d 766, 775-76 (8th Cir. 2003). The standard for establishing disparate treatment requires evidence that the individuals were similarly situated in all relevant respects and have "engaged in the same conduct without any mitigation or distinguishing circumstances." *Id.*

In the present action, there is no dispute Charles has met the first requirement of the *prima facie* case. Charles is of African-American descent. There has also been no dispute as to Charles's job qualifications. With the *prima facie* case, the only dispute is whether Charles suffered an adverse employment action under circumstances permitting an inference that the action was the result of unlawful discrimination.

Defendants claim there is not a fact dispute on this issue. ECF No. 16. According to Defendants, Charles did not suffer an adverse employment action that permits an inference of discrimination. Specifically, Defendants allege Charles was hired on or around September 10, 2020. ECF No. 15-1. In his "new hire" letter, Charles was admonished the following: "[t]he first 90 days of employment is considered a probation period . . . This probation period requires you to be on time with NO excessive tardiness or absentness. Your performance will be evaluated for continued employment." *Id.*

At the outset of his employment, Charles was assigned a specific truck to use to perform his work. He was assigned Unit No. 150. ECF No. 15-4, p. 12:11-12. On or around November 23, 2020, Unit No. 150 was sent to be repaired, and it was not released until on or around December 16, 2020. ECF No. 15-4, p. 13:5-15; ECF No. 15-5. While his normally assigned truck was being repaired, Charles was assigned other trucks. ECF No. 15-10, p. 66:3-20. On or around December

8, 2020, Charles was assigned to a different truck, Unit 209, which was a spare truck. ECF No. 15-4 at 12:6-18. On December 8-9, 2020, as he was using Unit 209, Charles reported it needed new tires and was "pulling." ECF No. 15-10, p. 82:4-16. New tires were put on Unit 209. *Id.* p. 82:17-21.

On December 9, 2020, the date of Charles's termination, Defendant Orr instructed all drivers to haul loads of pea gravel from Hampton, Arkansas to El Dorado, Arkansas. ECF No. 15-7, p. 16:11-17. The drivers were instructed to haul "as many loads as you could."[1] *Id.* Charles departed with his first load at 7:30 am, and he delivered that load. ECF No. 15-6. During the transport, Charles reported he encountered issues with truck "shaking and stuff real bad and pulling." ECF No. 15-10, p. 72:1-14. Due to the problems with his truck, at approximately 11:00 am, Charles took it to a mechanic's shop in El Dorado. ECF No. 15-9, p. 3.

Over the course of the next three hours, a mechanic inspected Unit 209:

Q: Okay. So tell me about looking at the truck. What all did you do?

A: Well, I checked it all out and made sure the lugs were right, tire tread was right. I just went—a visual overlook of the truck, drove the truck down the road, turned around, come back. The truck was fine. I mean, I didn't feel it was unsafe about nothing. I told him it looks good, and he got back in it and left.

ECF No. 15-4, p. 7:11-20.

After the initial inspection of the truck, the mechanic assessed Unit 209 as safe, and Charles again left the shop with Unit 209. ECF No. 15-4, p. 8:14-18. Shortly thereafter, Charles returned, and he represented that Unit 209 was still not driving correctly. *Id.* The mechanic again inspected and told Charles the following: "I cannot find nothing wrong with it. it ain't doing what you said it's doing." *Id.*, p. 18:17-25. Twenty minutes later, Charles returned for a third inspection, claiming

---

[1] According to Charles's testimony, depending on traffic, a driver should be able to haul about four loads when going between Hampton and El Dorado. ECF No. 15-10, p. 56:12-17.

the same issues were present with Unit 209. *Id.,* p. 9:21-25. For a third time, the mechanic inspected it, drove the truck, and returned it to Charles, reporting it was safe to drive. *Id.,* p. 10-11. Charles again left with Unit 209. *Id.*

After he left the mechanic in El Dorado, Charles did not resume hauling loads. Instead, Charles drove Unit 209 about eight minutes away from the mechanic's shop, and he parked it on the road for thirty-four (34) minutes. ECF No. 15-9, p. 3. After parking for that time, Charles then drove Unit 209 to a gas station in El Dorado and parked for one hour and forty minutes. ECF No. 15-9, p. 4. Charles testified during his deposition that he did not contact his supervisor, Defendant Orr, or his employer during this time. ECF No. 15-10, p. 99:7-100:2. Charles testified as follows:

> Q: Did you call Judge Mike Loftin[2] at this time?
>
> A: No. I did not. I didn't think that it needed to get that far. Again, I didn't contemplate it having to go that far. My understanding is that I recorded it. I was ignored to a certain extent about it. I wasn't satisfied with the so called service that they got for it to fix it to increase my safety and anyone else's. Only time I considered calling Mike Loftin was when Jeff terminated me and refused to basically listen or reconsider his decision.
>
> Q: Why were you going to call him then but not for the safety of the truck you were concerned about?
>
> A: Again, I didn't think it warrant for me to call him right then. I did not think I'd be terminated. Disciplined—yes. Terminated—no. I called him then because of what I kept repeating to Jeff about him asking me when I asked him was he sure that's what he was terminating me for, for refusing to drive and operate that unsafe truck? And he repeated it every time I asked him was yes. So, once I saw that he was not going to reconsider his decision, that's when I then made up my mind I need to go talk to Mike. I need to go over his head and let him know what was going on.
>
> Q: And did you call Jeff Orr at this time?
>
> A: Call Jeff when?
>
> Q: When you are sitting in your truck?

---

[2] Mike Loftin is the Union County Judge, and Charles's employer. ECF No. 15-1.

6

> A: No. In my understanding because Jeff stood there, like I said, right there beside Rudy while we was going back and forth about the condition of the truck. He heard everything. He heard it.

*Id.*

When Charles returned to work, Defendant Orr confronted him about having only one load ticket. ECF No. 15-7, p. 21:20-12. Charles admitted he had been a convenience store. *Id.* Defendant Orr asked Charles why he had not notified anyone about his stops, and Charles did not have a response. *Id.*, p. 22:20-23:2. At that point, Defendant Orr fired Charles:

> Q: Okay. And then what happened?
>
> A: I told him he pretty much fired his self for not doing his job.
>
> Q: Okay. And when you told him that, what did he—did he say anything?
>
> A: He asked for a second chance, and I said, "You spent your second chance at the convenience store."

*Id.*, p. 23:2-15. Defendant Orr then replaced Charles with an African-American female driver. ECF No. 15-7, p. 27:8-17.

To establish an inference of discrimination, Charles can use a variety or proof: showing more favorable treatment of similarly-situated employees who are not in a protected class, biased comments by a decisionmaker, or replacement by someone outside the protected class. *See, e.g., Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). Here, to demonstrate this inference, Charles provides speculation about two similarly-situated Caucasian individuals, one of which he only "heard" had not been terminated after being caught shopping during work hours. ECF No. 15-10, p. 130:4-17. The other was not terminated because he completed his work and did two loads in Unit 209 the morning after Charles was terminated. ECF No. 15-11. Charles has the burden of demonstrating that either of these individuals were "similarly situated." *See Moss v. Texarkana Ark.*

*Sch. Dist.,* 240 F. Supp. 3d 966, 975 (W.D. Ark. 2017).  Here, Charles has not met that burden and has not created a fact issue on this element of a *prima facie* case.

### 2. Non-Discriminatory Reason for Termination and Pretext

Even assuming Charles could present a *prima facie* case, Defendants are still afforded the opportunity to supply a legitimate, non-discriminatory reason for the termination.  As recognized above, once a plaintiff presents a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *See McDonnell Douglas Corp.,* 411 U.S. at 802-3.  If the employer satisfies this burden, the plaintiff must prove the proffered reason is a pretext for discrimination.  *See id.* at 804-05.

In the present action, Defendants have presented a legitimate, non-discriminatory reason for termination: Charles's decision to not perform his job.  While Charles argues Unit 209 was not operable, he still could have notified his employer of his decision to not perform his job due to his safety concerns.  Undisputedly, he did not do this.  According to the record before the Court, Charles was on the last day of his ninety-day (90) probationary hire period when he was terminated from his employment.[3]

Furthermore, since Defendants have supplied a legitimate, nondiscriminatory reason for his termination, Charles has the burden of proving pretext. Based upon the record before this Court and as outlined above, Charles has not supplied sufficient evidence to create a fact issue as to pretext. *See Aucutt v. Six Flags Over Mid-America,* 85 F.3d 1311, 1317 (8th Cir. 1996) (recognizing that mere suspicion, conjecture, or allegation that the asserted reason is pretext and the employer's true motivation was discrimination will not, without more, defeat the employer's motion for summary judgment).

---

[3] Charles was hired on September 10, 2020, and he was terminated on December 9, 2020.  ECF No. 15-1.

As a final point on this claim, Charles has sued Defendant Orr in his individual capacity also. ECF No. 4. Under the facts in this case, such claims are barred under both 1983 and under the ACRA. *See* ARK. CODE ANN. §16-123-107(c). *See also Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (recognizing qualified immunity applies when "government officials" perform "discretionary functions" are generally shielded from liability for civil damages in 1983 actions).

### B. Public Policy Violation

Charles claims he was terminated because he refused to drive an unsafe vehicle. ECF No. 4 at 3. He claims this was unlawful retaliation to his voicing concerns on an issue of public policy: the safety of his vehicle. *Id.* "By virtue of the facts alleged herein, Defendants have violated his rights to due process and under the Arkansas and U.S. Constitutions to speak and petition by wrongfully discharging him in violation of public policy." *Id.*

Charles is correct that such protection from wrongful discharge has been adopted in Arkansas as an exception to the at-will employment doctrine. *See Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 249, 743 S.W.2d 380, 385 (1988). As stated in *Sterling,* "we hold that an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state." *Id.*

Here, Charles argues the public policy is an Arkansas law that requires any person operating a vehicle to keep it in good working order. *See* ARK. CODE ANN. § 27-32-101. He claims he was terminated because he refused to drive a vehicle that was not in proper working order. As an initial mater, the Court finds there is some fact dispute as to the status of the vehicle. Defendants have supplied evidence from a mechanic that Unit 209 was safe to operate, and Charles has presented his testimony disagreeing with the mechanic. The evidence presented indicates Unit 209 did need a front-end alignment. *See* ECF No. 15-12.

Likewise, Charles has presented evidence to create a triable fact issue as to the basis of his termination.  Defendants have offered evidence that Charles was terminated because he did not complete his job of carrying loads and did not notify anyone that he chose to not work.  Charles has presented his testimony that he was terminated because he refused to drive an unsafe vehicle.  Based upon the record before the Court and the state of Unit 209, the Court cannot find summary judgment is appropriate as to Charles's second claim.  Viewing facts in a light most favorable to Charles, the Court cannot grant summary judgment on his second claim.

### IV.     Conclusion:

For the foregoing reasons, this Court finds Defendants' Motion for Summary Judgment (ECF No. 15) should be **GRANTED IN PART** as to Charles's first claim and **DENIED IN PART** as to Charles's second claim.

**ENTERED this 5th day of December 2022.**

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE